IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANE DEVINE, *individually and as Administratrix of the Estate of Michael F. Devine, Jr., deceased* Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. 14-1072 |
| MIDDLETOWN TOWNSHIP; MIDDLETOWN TOWNSHIP POLICE DEPARTMENT; JOSEPH SCHUCK; JOSEPH BUCKLEY; and MARK LEONHAUSER Defendants. | : | |

**MEMORANDUM**

**Jones, II J.** **August 1, 2016**

## I. Introduction

Plaintiff Diane Devine—Decedent Michael Devine's wife and the administrator of his estate—commenced this action against Defendants alleging various civil rights and common law violations regarding the shooting death of Mr. Devine. In particular, Plaintiff claims the police failed to utilize specialized training to deal with emotionally disturbed individuals, thereby resulting in the unreasonable use of excessive force. Defendants have filed a Motion for Summary Judgment, which is now ripe for this Court's review. For the reasons set forth herein, Defendants' Motion shall be granted.

## II. Factual Background

The undisputed facts[1] establish that on February 23, 2012 at approximately 3:37 a.m., Michael Devine placed a 9-1-1 call to report two burglars in the basement of a residence located at 1637 West Lincoln Highway, Langhorne, Pennsylvania. (SUF ¶ 2) Mr. Devine told dispatch he would be waiting for police outside the house in a green Volkswagen Passat. (SUF ¶ 3) In response, officers from the Middletown Township Police Department were dispatched, with Officer Joseph Schuck being the first to arrive on the scene. (SUF ¶¶ 4-5.) Officer Schuck reported that he drove his marked police vehicle up to a male wearing a dark sweatshirt with the hood pulled tightly around his face. (SUF ¶¶ 5-6.) The officer lowered his window to speak with the man, at which time the man revealed himself to have a knife and told Officer Schuck he was going to kill him. (SUF ¶¶ 7, 9.) Officer Schuck drove 30 to 40 feet forward to the end of the street and exited his vehicle. (SUF ¶¶ 8, 10.) Upon doing so, the officer drew his weapon and ordered the man to stop and drop the knife. (SUF ¶ 10.) Ignoring the officer's directives, the

[1] For purposes of this discussion, this Court shall refer to Defendants' Statement of Undisputed Facts as "SUF" and Plaintiff's Response thereto as "RSUF." The court notes that although Plaintiff denies every statement of fact by Defendants except one, Plaintiff's Response is largely devoid of specific citations to the record to support her denials. As this Court's Policies and Procedures clearly mandate,

> All summary judgment motions and oppositions to such motions must contain a recitation of facts with complete and accurate citation to the record . . . ***Without exception, all facts set forth shall be deemed admitted unless addressed by the opposing party as set forth herein*** . . . The Court will not consider any description of a fact that is not supported by citation to the record. Statements of Material Facts in support of or in opposition to a motion for summary judgment must include specific and not general references to the parts of the record that support each of the statements, such as the title of or numbered reference to a document, the name of a deponent and the page(s) of the deponent's deposition, or the identity of an affidavit or declaration and the specific paragraph relied upon. ***Pinpoint citations are required***.

*See* "*Judge C. Darnell Jones II Chambers Policies and Procedures*," Civil Cases, §D(4)-(5) (emphasis added); *see also* Fed.R.Civ.P. 56.

Accordingly, any facts denied by Plaintiff without pinpoint citations to the record shall be deemed admitted.

man began to approach in a shuffling "zombie walk" manner, somewhere between walking and running. (RSUF ¶ 10.) Officer Schuck repeatedly ordered the man to stop and drop the knife but the individual continued to approach with the knife raised, repeating that he was going to kill the officer. (SUF ¶¶ 11-12.) Officer Schuck began stepping back to create space between himself and the man, eventually reaching a grassy incline. (SUF ¶¶ 11, 13; RSUF ¶ 13.) At this point, Officer Schuck feared for his safety and mentally prepared to discharge his weapon. (SUF ¶ 14.) While this was occurring, Officer Daniel Buckley arrived on the scene and witnessed Officer Schuck retreating up the grassy slope with the man wielding the knife from approximately 10 feet away. (SUF ¶¶ 15-16.) In response to these events, Officer Buckley shouted orders for the individual to stop and drop the knife, however the man instead turned and began to approach Officer Buckley. (SUF ¶¶ 16-17, 19.) Despite Office Buckley's repeated commands to stop and drop the knife, the man transferred the weapon from his right to left hand, told Officer Buckley he was going to kill him, and took another step towards the officer. (SUF ¶¶ 18-19.) The man continued towards Officer Buckley, at which time the officer again ordered he stop and drop the knife. (SUF ¶¶ 19-20-21.) The man took yet another step towards Officers Buckley, at which time Officer Buckley discharged his firearm. (SUF ¶¶ 19, 21.) This shot caused the man to fall to the ground, where he was disarmed by the third officer to arrive at the scene, Officer Mark Leonhauser. (SUF ¶¶ 23-24.) Officer Leonhauser, accompanied by Sergeant Feeney and Officer Webb, then entered the residence at 1637 West Lincoln Highway to see if they could locate the second person originally reported to have been burglarizing the house but found no one inside and the premises appeared undisturbed. (SUF ¶ 25; Defs.' Mot. Summ J. Ex. 5 at 2.) Meanwhile, another officer (Stum) administered first aid to the man, subsequently identified as

Michael Devine. (SUF ¶ 26; RSUF ¶ 26.) An ambulance transported Mr. Devine to the hospital, where he later died. (SUF ¶ 27.)

## III. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted). Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing"--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001) (quoting *Celotex*, 477 U.S. at 325). "[A] nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in its pleadings[.]" *Williams v. West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted). Accordingly,

summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV. Discussion

### A. Excessive Force

#### i. Officer Buckley

In order to sustain an excessive force claim brought under to 42 U.S.C. §1983, "a plaintiff [must] show that a seizure occurred and that it was unreasonable." *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) (citing *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999)); *see also Graham v. Connor*, 490 U.S. 386, 388 (1989) (holding that seizures and excessive force claims against law enforcement should be analyzed under the Fourth Amendment's "objective reasonableness standard"). The court must determine "objective reasonableness" through a thorough analysis of the totality of the circumstances "as viewed from the perspective of the officer on scene." *Kopec v. Tate*, 361 F.3d 772, 776-777 (3d Cir. 2004) (citing *Graham*, 490 U.S. at 396-397). The circumstances must also be viewed "without regard to [the officer's] underlying intent or motivations." *Phong Duong v. Telford Borough*, 186 F. App'x 214, 217 (3d Cir. 2006) (quoting *Graham*, 490 U.S. at 397.) In doing so, the court considers, among other things, "(1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene." *Santini v. Fuentes*, 795 F.3d at 417 (citing *Graham*, 490 U.S. at 396). "The 'objective reasonableness' test of an officer's actions is meant to give 'deference to the judgment of reasonable officers on the scene,' and we are 'cautioned against the 20/20 vision of hindsight.'" *Phong*, 186 F. App'x at 217 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

Where the principal witness—here, the decedent—is unable to testify, "a court should avoid simply accepting 'what may be a selfserving account by the officerf[s]. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.'" *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).[2] However,

> This is not to say that the summary judgment standard should be applied with extra rigor in deadly-force cases. Rule 56 contains no separate provision governing summary judgment in such cases. *Cf. Wallace v. SMC Pneumatics, Inc*., 103 F.3d 1394, 1396 (7th Cir. 1997). Just as in a run-of-the-mill civil action, the party opposing summary judgment in a deadly-force case must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, 'and may not rely simply on the assertion that a reasonable jury could discredit the opponent[s'] account.' *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003).

*Lamont*, 637 at 182.

While "reasonableness" is more commonly a question for the jury, a defendant can prevail on summary judgment if "after resolving all factual disputes in favor of the plaintiff, the record demonstrates that the officer's use of force was objectively reasonable under the circumstances." *Kopec*, 361 F.3d at 772 (quoting *Scott*, 39 F.3d at 915). "In assessing the reasonableness of the officers' actions, we account for the fact that they must make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." *Kubicki v. Whitemarsh Twp*., 270 F. App'x 127, 129 (3d Cir. 2008) (quotation marks and internal citations omitted).

[2] "Even where the officer must stand trial, he still benefits from the favorable law precluding consideration of intent or motive, use of hindsight in judging tense, unpredictable situations, and allowances for mistaken judgments…" *Bennett v. Murphy*, 274 F.3d 133, 137 (3d Cir. 2001) (quoting *Bennett v. Murphy*, 127 F. Supp. 2d 689, 694 (W.D. Pa. 2000)).

In this case, there is no dispute that the officers recognized Mr. Devine was not walking normally. However, it is also undisputed that Mr. Devine: was concealing his identity in a dark sweatshirt with the hood tied closely around his face; was armed with a large knife; had repeatedly disobeyed the officers' commands; and, had come to within twenty-one (21) feet of each officer[3] with the knife raised and pointed towards Officers Schuck and Buckley,

---

[3] This Court is compelled to point out that Plaintiff's Response to the instant motion is replete with omissions of fact and conclusions of law. The following are just a few examples:

- In support of Plaintiff's claim that Mr. Devine was could barely walk, she states in her brief:

> Defendant Schuck described Mr. Devine in the following way: "He was approaching—it was strange—the best way to describe it, and I'll try to get a little better, but it almost looked like a—what we see commonly in television movies like a zombie walk, like he was walking strange . . ."

(Pl.'s Br. Opp'n Summ. J. 13) (emphasis added).

However, when read in context, the testimony establishes that Mr. Devine was not as feeble as described by Plaintiff:

> Q. How was he approaching you?
>
> A. He was approaching -- it was a strange -- the best way to describe it, and I'll try to get a little better, but it almost looked like a -- what we see commonly in television movies like a zombie walk, like he was walking strange, but right at me, it was -- ***it wasn't a walk***. ***It wasn't a run. It was something in between.***
>
> It was strange, not like something I've typically seen from just normal walking or anything.
>
> Q. Would you say he was shuffling?
>
> A. Something similar, yes, something like that.
>
> Q. I think of a person who's shuffling as they're not really fully lifting, you know, their feet up and down as they either walk or run; they're kind of-- they're shuffling.
>
> It was something ***-- it was maybe a fast shuffle or a slow and awkward run***. It was – I couldn't describe it exactly. It was unusual, but he was making progress.

(Schuck Dep. 51:10-24; 52:1-6, Oct. 31, 2014)(emphasis added).

Officer Schuck further testified that the manner in which Mr. Devine approached "added to how frightening it was because it was – it was creepy" . . . "[I]t was creepy and it seemed unusual, but nobody else has tried to kill me before. So maybe it's not unusual. Maybe it's what happens when people appear homicidal." (Schuck Dep. 91:22-23, 94:7-10.) When asked about distances, Officer Schuck further testified "it was nighttime. So I can't say that for certain. He started to advance. By the time I had stopped, he had advanced . . . he had

advanced enough that I was worried - - I was worried I was going to be killed." (Schuck Dep. 73:10-15.)

Officer Buckley testified that Mr. Devine approached Officer Schuck "aggressively . . . almost like a fighting stance, where he's bending slightly at the knees, to keep himself balanced, like a boxer would do[.]" (Buckley Dep. 81:1-24, Oct. 21, 2014.) Officer Buckley further specified that Mr. Devine "was hunched over, not locking his knees, almost – so he could turn quickly or be flexible with his movement. He wasn't walking erect. He looked like he was getting ready to charge" and that Mr. Devine was not walking at a slow pace but instead, "was moving with a purpose . . . it's not fast, it's controlled, but it's meant to get him where he needs to be . . . what was going through my mind at the time was that he was moving in on Officer Schuck to kill Officer Schuck." (Buckley Dep. 83:6-10, 84:5-6, 11-12, 17-19.)

- With regard to the "elderly" characterization of Mr. Devine by Plaintiff, he was sixty-four (64) years old at the time of the shooting. (Defs.' Mot. Summ. J. Ex. 9 at 1; Coroner's Rep. 1) Additionally, he had a hood tied tightly around his face at the time of the incident, thereby preventing the officers from seeing most of his facial features. (Buckley Dep. 77:9-15) ("[He] had a hoodie, a hooded sweatshirt, and the hood was drawn tight around his face . . . I just saw maybe his nose and the knife."); (Leonhauser Dep. 16:13-18, Oct. 31, 2014) ("Mr. Devine had on a hoodie which was drawn tight. I remember it because as I was running up I could see the hoodie on him, and I did not know - - I didn't know if it was a man or woman. I didn't know if he was 20 or 80. I could not tell.").

- Plaintiff concludes that "[c]haotically, all three men were screaming varying and conflicting commands from different directions around Mr. Devine." (Pl.'s Br. Opp'n Summ. J. 14.) Plaintiff's characterization of "chaotic" is not based on any evidence of record. More importantly, the record is devoid of evidence to establish that the officers' commands were "conflicting." (Pl.'s Br. Opp'n Summ. J. 14; McCauley Report dated Jan. 12, 2015 at 13.) This Court takes judicial notice of the fact that *Merriam Webster* defines "conflicting" as "being in conflict, collision, or opposition: incompatible." *Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/conflicting (last visited July 26, 2016). The officers' commands in this case were not conflicting but instead, were consistent commands that when taken together, were aimed at protecting their safety, *i.e.*, "put the knife down, get on the ground"; "stop . . .drop the knife"; "stop, drop the knife, get on the ground." (Buckley Dep. 89:22-25, 95:9-9; Schuck Dep. 73:17-18, 74:6-7; Leonhauser Dep. 12:10-11.)

- Plaintiff maintains a genuine issue of material fact exists regarding how many steps Mr. Devine took towards Officer Buckley before a shot was fired. Officer Buckley testified that Mr. Devine took approximately three or four steps towards him with the knife raised and while stating "I'm going to kill you." (Buckley Dep. 94:12-25, 95:1-21, 97:10-18.) Officer Leonhauser testified that his observations only lasted a few seconds and that during that time, Mr. Devine "stops, turns, and then takes a step toward [sic] Officer Buckley. So in that three seconds that that occurred, that two to three seconds, yes, there is a time, but if you're going to ask me to be anymore [sic] specific that that, I don't know that I can be." (Leonhauser Dep. 15:13-18.) With that said, counsel next asked Officer Leonhauser if Mr. Devine took more than one step in the direction of Officer Buckley, to which Officer Leonhauser responded "I saw him take one step and then the shot happened." (Leonhauser Dep. 16:2-3.) Regardless of exactly how many steps Mr. Devine took towards Officer Buckley, it is undisputed that he

respectively. Moreover, all of these events occurred within approximately one minute and as police were responding to the 9-1-1 report of a burglary in progress at that location.

In opposition to the instant motion, Plaintiff's offer the expert opinion of Dr. R. Paul McCauley,[4] which Defendants previously sought to preclude. The matter was referred to United States Magistrate Judge Lynne A. Sitarski, who ruled that to the extent Dr. McCauley's opinions included legal conclusions that invaded the province of the fact finder, said conclusions were not admissible. (ECF No. 58 at 12-14.)

Dr. McCauley's report is largely premised on the foundation that the officers —particularly Schuck—were aware or should have been aware that Mr. Devine was emotionally disturbed because of his "bizarre conduct." However, Plaintiff points to no evidence to establish that Mr. Devine was an "emotionally disturbed person" at the time of the incident or that the officers had any knowledge or reason to know Mr. Devine was emotionally or mentally unstable. As noted earlier, Plaintiff focuses on Officer Schuck's use of the word "zombie" during his deposition, while simultaneously omitting all of the other characteristics that were consistently provided by the officers to describe the manner in which Mr. Devine approached them, *e.g*. somewhere between a walk and a run, aggressively, boxer-like stance, looking "like he

---

was within approximately 12 to 15 of the officer with a butcher knife raised in a threatening manner, stating "I'm going to kill you."

[4] Plaintiff also attaches a portion of an expert report prepared by Joseph J. Stine. (Pl.'s Br. Opp'n Summ. J. Ex. C.) Although Mr. Stine determined that "Officer Schuck placed himself in mortal danger when he backed up the grassy hill with the knife wielding man in close pursuit[,] he recognized the fact that the "danger came from having an assailant with an edged weapon less than 21 feet away. That danger was compounded because in the dark of the early morning hours Officer Schuck was backing up on a grassy incline, This was a potentially deadly risk that Mr. Devine was exposing Officer Schuck to." (Pl.'s Br. Opp'n Summ. J. Ex. C, 10-11.) Based upon a totality of the circumstances surrounding the incident as contained in the record now before this Court, Mr. Stine also determined that there was no way for the officers to know whether or not Mr. Devine was emotionally disturbed. (Pl.'s Br. Opp'n Summ. J. Ex. C, 16-19.) With the exception of the one aspect regarding Officer Schuck as just discussed, Mr. Stine found the officers' conduct to be proper and reasonable in all other regards.

was getting ready to charge." (Schuck Dep. 51:16-17, 52:3-6; Buckley Dep. 81:1-2,16-18, 83:9-10, 98:5-6, 135:22-24.) Plaintiff similarly refers to Decedent as "elderly" on numerous occasions, yet omits any reference to testimony that clearly established Mr. Devine had a sweatshirt hood tied tightly around his face, thereby concealing his identity.[5] Further, he was not using a cane and gave no indication that he might have a medical condition. (Schuck Dep. 81:16, 94:16-19; Leonhauser Dep. 16:13-18.)

Dr. McCauley also concludes that Officer Schuck "should have used time to their [sic] advantage and via radio communication and/or face-to-face communications with PO Buckley and/or other officers present, developed and coordinated a quick tactical field plan. (McCauley Rep. 13.) Dr. McCauley further opined and Buckley should have "operate[d] as a coordinated two[-]man team" to deal with the situation. (McCauley Rep.13.) Aside from the fact that the entire incident happened within approximately one minute and Mr. Devine was positioned essentially between the officers, the portable radio Officer Buckley had on his person had become inoperable. (Buckley Dep. 102:9-10; 135:4-8; 136: 12-23.) Inasmuch as Mr. Devine repeatedly refused orders to drop the knife he was holding and continued to aggressively approach Officer Buckley while stating "I'm going to kill you[,]" the evidence of record demonstrates there was no opportunity to "coordinate" a "team" or develop and implement a "plan." (Buckley Dep. 94:12-17; 95:4-21; 97:3-18; 98:5-6; 135:22-24); *see also* Schuck Dep. 60:2-5 ("This was going quick. Time for a ton of consideration really wasn't there. What I did consider, and what I did do, acting as soon as I could to protect myself, was to draw the firearm.").

---

[5] *See supra*, note 3.

Additionally, Dr. McCauley goes to great lengths to attempt to demonstrate how the officers' conduct violated the Middletown Township Police Protocols. However, for purposes of assessing an excessive force claim such as the one at bar, "[a]lthough the particular practices of law enforcement entities may 'vary from place to place and from time to time,' the objective reasonableness of a police officer's actions under the Fourth Amendment does not 'turn upon such trivialities.'" *Ickes v. Borough of Bedford*, 807 F. Supp. 2d 306, 320-321 (W.D. Pa. 2011) (quoting *Whren v. United States*, 517 U.S. 806, 815 (1996)); *see also Manigault v. King*, 339 F. App'x 229, 232 (3d Cir. 2009) ("Although the officers were trained to maintain a distance of at least 21 feet when facing a suspect carrying a knife, their abandonment of this protocol cannot form the basis for a remedy under § 1983 or deprive them of qualified immunity."); *Johnson v. City of Phila.*, 105 F. Supp. 3d 474, 481 n.5 (E.D. Pa. 2015) (same); *Mohney v. Hageter*, Civ. No. 11-340, 2013 U.S. Dist. LEXIS 12098, at *21-22 (W.D. Pa. Jan. 30, 2013)("Plaintiff's reliance on state police policy guidelines is misplaced. The source of [the decedent's] rights is the Fourth Amendment to the United States Constitution, rather than the Pennsylvania State Police procedures manual. Because the Fourth Amendment protects citizens from unreasonable seizures, the ultimate issue is whether the officers acted reasonably, not whether they followed department guidelines.").

When questioned at deposition about the opinions set forth in his Reports, Dr. McCauley ultimately conceded that under the circumstances at the time of the incident, the officers were not required to retreat and that there exists no criminal or civil law that prohibited their use of deadly force when faced with the proximate threat of deadly force. (McCauley Dep. 51:4-11, 56:3-5, 58:7-10; 84:9-25, 85:1-4.) Plaintiff has come forth with no evidence to dispute this critical fact; argument and conclusions of law do not suffice.

Accordingly, there remains no genuine issue as to material fact regarding the propriety of the force used by Officer Buckley and summary judgment is appropriate as to this Defendant on this claim.

**ii. Officers Schuck and Leonhauser**

With specific regard to Officers Schuck and Leonhauser, it is well established that "to prevail on a §1983 claim against multiple defendants, a plaintiff must show that each individual defendant violated his constitutional rights.'" *Grant v. Winik*, 948 F. Supp. 2d 480, 498 (E.D. Pa. 2013) (quoting *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005)). Under very limited circumstances, "a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002).

Defendants argue summary judgment is appropriate with regard to Plaintiff's excessive force claims against Officers Schuck and Leonhauser because neither used any force against Mr. Devine. (Defs.' Mot. Summ. J. 13.) Inasmuch as this Court finds Officer Buckley did not employ excessive force under the circumstances with which he was faced, Officers Schuck and Leonhauser cannot be held liable for unholstering their guns and commanding that Mr. Devine stop, drop the knife, and get on the ground, in an effort to save not only Officer Buckley's life, but their own, as well.

Accordingly, Defendants Schuck and Leonhauser are similarly entitled to judgment in their favor with regard to Plaintiff's excessive force claim.[6]

---

[6] With regard to her excessive force claims against all officer defendants, this Court notes that Plaintiff has failed to substantively contest two critical points. First, the uncontroverted testimony establishes that during the relevant time period, the officers believed they were in pursuit of two burglars in the immediate vicinity and that the knife-wielding man who threatened to kill them was one of the perpetrators. (Buckley Dep. 101:7-14; Leonhauser Dep. 21:19-24,

**B. State-Created Danger**

In addition to Plaintiff's excessive force claim, she brings a state-created danger claim against Defendants. In order to establish the existence of a state-created danger, a plaintiff must prove four factors:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (quotation marks and citations omitted). With specific regard to the second element, in addition to proving that the officer's conduct "shocks the conscience[,]" a plaintiff must also prove that the officers realized as much at the time and deliberately disregarded "not just a substantial risk, but a great risk that serious harm would result." *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002).

Quite significant to the instant matter, is the tenet that:

> A plaintiff faces the highest bar when the state actor accused of wrong-doing was faced with a "'hyperpressurized'" environment requiring a snap judgment. In such cases, we permit recovery only if the state actor had an actual intent to cause harm. By contrast, "where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." Importing aspects of Eighth Amendment jurisprudence, we have defined "deliberate indifference" as requiring "conscious[ ] disregard [of] 'a substantial risk of serious harm."' In any event, "[m]ere negligence is not enough to shock the conscience"

---

22:1-2; McCauley Rep.4, 12; Defs.' Mot. Summ. J. Ex. 1.) Second, Mr. Devine was holding a knife with an eight-inch blade in a threatening manner while within just several feet of the officers, thereby justifying their use of lethal force to protect their own lives.

*Vargas v. City of Phila*., 783 F.3d 962, 973-974 (3d Cir. 2015) (internal citations omitted).

In this case, the officers arrived on the scene not knowing who was standing in the street wearing a dark sweatshirt with the hood tied tightly around their face, wielding an 8-inch-blade butcher knife. The entire incident occurred within approximately one minute, during which time the individual—later identified as Mr. Devine—pursued Officer Schuck and then Officer Buckley while holding the blade of the knife toward them and repeatedly stating that he was going to kill them. The record clearly establishes that Defendants reasonably assumed the individual was one of the perpetrators they were called to apprehend for an alleged burglary. Inasmuch as Defendants' conduct was reasonable and not deliberately indifferent, it necessarily fails to "shock the conscience."[7]

For these reasons, Defendants' shall be granted judgment on this claim.

### C. Supervisory / Municipal Liability[8]

Defendants next seek summary judgment on Count Three of Plaintiff's Complaint, in which she alleges that the Township's policies and/or customs inflicted injury upon Mr. Devine.

---

7 Plaintiff argues that Officer Buckley shot Mr. Devine without ever giving him "the opportunity to comply" with Buckley's commands to stop and drop the knife and that said action "shocks the conscience." (Pl.'s Br. Opp'n Summ. J. 28.) Aside from the legal justification discussed more fully hereinabove, Mr. Devine had several opportunities to comply with these directives, as Officer Schuck had given the same commands just seconds earlier. Instead of complying at that time, Mr. Devine turned his attention to Officer Buckley, advancing within 12 to 15 feet of him with the knife held in a threatening position while stating "I'm going to kill you."

8 Count III of Plaintiff's Complaint is entitled "Supervisory Liability, 42 U.S.C. § 1983." (Compl. ¶¶ 66-75.) In said Count, Plaintiff states in pertinent part that "Defendants were responsible for, acquiesced , and/or were deliberately indifferent through policy, practice, customs, and/or procedures . . . " (Compl. ¶ 66.) Inasmuch as Plaintiff uses the terms "supervisor [sic] liability" and "municipal liability" interchangeably in their Opposition Brief, this Court shall construe Count III as a claim for both and as directed against Defendants Middletown Township and the Middletown Township Police Department.

As a preliminary matter,

> When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. In other words, the County may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in respondeat superior, but it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom.

*Mulholland v. Gov't County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (quotation marks and internal citations omitted).

Therefore, a party alleging such liability under Section 1983 "must show that they were deprived of 'rights, privileges, or immunities secured by the Constitution and laws,' and that the deprivation of those rights was the result of an official government policy or custom." *Id*. at 236 (quoting 42 U.S.C. § 1983). It necessarily follows that "if there is no violation in the first place, there can be no derivative municipal claim." *Id*. at 238 n.15 (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

Inasmuch as Plaintiff has failed to demonstrate any such deprivation, her supervisory / municipal liability claim is rendered legally moot and Defendants are entitled to judgment on same.

**D. Qualified Immunity**

In response to all of Plaintiff's constitutional claims, Defendants raise the affirmative defense of qualified immunity. This Court finds that even if Plaintiff was successful on her excessive force claim, Defendants would be entitled to qualified immunity.

The doctrine of qualified immunity has been explained as follows:

> "Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." The doctrine of qualified immunity shields government officials who perform discretionary functions "from liability for civil damages

> insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Santini v. Fuentes*, 795 F.3d at 416-417 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In determining the applicability of qualified immunity to a particular scenario,

> The formula for analyzing a qualified immunity claim is a several stage process. First, the court is to decide whether a constitutional violation has occurred, and then it must proceed to determine whether that right was clearly established at the time of the alleged violation. A defendant may . . . be shielded from liability for civil damages if [his] actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
>
> * * * *
>
> Once these requirements are found to have been satisfied, the inquiry proceeds to another, closely related issue, that is, whether the officer made a reasonable mistake as to what the law requires. *Saucier* emphasized that the inquiry for qualified immunity eligibility is distinct from establishment of a constitutional violation of excessive force. As the Court explained, the concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct . . . if the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Carswell v. Borough of Homestead*, 381 F.3d 235, 241-42 (3d Cir. 2004).

There is a clearly established "prefer[ence] to resolve the qualified immunity issue at the summary judgment, or earlier, stage." *Id*. at 241.

As discussed at length hereinabove, no constitutional violation occurred because the force utilized by the officers was objectively reasonable.[9] As such, this Court need not reach the question of "whether the officer made a reasonable mistake as to what the law requires." *See*

---

9 With regard to Dr. McCauley's opinions regarding the officers' alleged failure to follow police department policies and protocols, the same does not preclude application of qualified immunity. *Ickes*, 807 F. Supp. 2d at 323 ("[A]lleged failure to conform [officer's] conduct to state or local law cannot defeat his entitlement to qualified immunity.") (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.").

*Bornstad v. Honey Brook Twp.*, 211 F. App'x 118, 125 (3d Cir. 2007) (finding no need to proceed through qualified immunity analysis when a plaintiff has not established the existence of a constitutional violation).

Therefore, assuming *arguendo* summary judgment would not be appropriate with regard to Plaintiff's excessive force claims against Defendants, said Defendants would be entitled to qualified immunity, as Plaintiff has put forth insufficient evidence to show that "every 'reasonable official' in Officer [Buckley's] shoes would have understood 'beyond debate' that [discharging his firearm at Mr. Devine] constituted excessive force." *Brown v. Cwynar*, 484 F. App'x 676, 681 (3d Cir. 2012) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011)).

**E. Common Law Claims**

Defendants additionally seek summary judgment on Plaintiff's common law claims of assault and battery, and negligence.

Under the Federal Rules of Civil Procedure,

> The district courts may decline to exercise supplemental jurisdiction over a claim. . . . if-- (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

28 U.S.C. 1367(c).

The Third Circuit has directed that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Ashton v. City of Uniontown*, 459 F. App'x

185, 191 (3d Cir. 2012) (quoting *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)).

When viewed against the backdrop of Plaintiff's federal claims, it would not be judicially economical, nor convenient or fair for the parties to have to commence litigation in state court regarding these two remaining claims. As such, this Court shall address same on the merits.

**i. Assault and Battery**

Under Pennsylvania law, "[a] police officer may be held liable for assault and battery when [the factfinder] determines that the force used in making an arrest is unnecessary or excessive." *Glass v. City of Philadelphia*, 455 F. Supp. 2d 302, 366 (E.D. Pa. 2006) (quoting *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)). Where there is there was "no finding of excessive force by the officers . . . there can be no claim for liability for assault and battery." *Id.*

Inasmuch as the officers did not utilize excessive force in this matter, Plaintiff's assault and battery claim fails under Pennsylvania law. *See Rodriguez v. Panarello,* 119 F. Supp. 3d 331, 345 (E.D. Pa. 2015) (state assault and battery claim based on allegedly willful misconduct necessarily fails when there has been a finding that an officer's use of force was objectively reasonable). Accordingly, Defendants shall be granted judgment on this claim.

**ii. Negligence**

Lastly, Defendants seek summary judgment on Plaintiff's negligence claim. With specific regard to Defendants Middletown Township and Defendant Middletown Township Police Department, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa.C.S.A. § 8541. As to the remaining Defendants, "[a]n employee of a local

agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter." 42 Pa.C.S.A. § 8545. There are certain enumerated exceptions to these rules, none of which apply here.[10] However, Plaintiff invokes the "willful misconduct" provision set forth in Section 8550, which permits recovery "[i]n any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct[.]" 42 Pa.C.S.A. § 8550. In support of same, Plaintiff maintains that the officers knew Mr. Devine was emotionally disturbed and therefore committed willful misconduct.

Again, Plaintiff has provided no evidence of record to demonstrate that the officers knew or should have known Mr. Devine was emotionally disturbed. Accordingly, their actions did not constitute willful misconduct and Plaintiff's negligence claim against Defendants fails.

---

[10] Exceptions include situations involving: vehicle liability; care, custody or control of personal property; real property; trees, traffic controls and street lighting; utility service facilities; streets; sidewalks; and, care, custody or control of animals. 42 Pa.C.S.A. § 8542(b).

## IV. CONCLUSION

As Plaintiff acknowledges, a party opposing summary judgment must "do more than simply show there is some metaphysical doubt as to material facts." (Pl.'s Br. Opp'n Summ. J. 9) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Plaintiff herein has failed to do so. This is undoubtedly a tragic case that has presumably left all involved with many more questions than answers. However, the record—when assessed in its entirety— clearly demonstrates that under the circumstances in which the officers found themselves during the dark, early morning hours of February 23, 2012, their conduct was not unreasonable. Accordingly, Defendants' Motion shall be granted in its entirety.

An appropriate Order follows.

BY THE COURT:

/s/ C. Darnell Jones, II J.